# IN THE UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF ARKANSAS

### FAYETTEVILLE DIVISION

U. S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

FEB 0 X 2012

CHRIS R. JOHNSON, CLERK

BY

DEPUTY CLERK

Robert L. Rutz, et al

206 Madison 3180

Huntsville, AR 72740

479-665-2887,

      Plaintiffs,

vs.

Discover Financial Services, et al

2500 Lake Cook Road

Riverwoods, IL 60015-3851,

      Defendants.

Civil Action No. 12 – 5024

**PETITION FOR RECOVERY OF DOMAIN NAMES**

**DiscoverDiscounts.com,**

**DiscoverPhone.mobi,**

**DiscoverRebate.com,**

**DiscoverRebates.mobi,**

**Other domain names to be added as this case develops;**

**AND**

## FOR RECOVERY OF $100,000,000,000.00 COMPENSATORY DAMAGES

### AND

## FOR IMPOSITION OF $200,000,000,000.00 PUNITIVE DAMAGES

## A.  Why is this case filed in this court?

1..    It is a trademark case which should have been litigated in Federal Court in the first place, as will

be shown in these pleadings.

**B. Who are the parties?**

1.     Plaintiff Robert L. Rutz, hereinafter called "Rutz", is filing this petition in forma pauperis because the 10-day deadline imposed by the National Arbitration Forum (hereinafter called NAF) from a UDRP (Uniform Domain Resolution Policy) arbitration caught him in a cash flow bind where he didn't have the $350 filing fee.

2.     At $350 or $420 per hour, neither could he afford an hour's worth of help from an experienced trademark attorney to correctly format and plead it, so he is filing it in pro se.

3.     In the UCRD arbitration, Discover Financial Services was Complainant and Rutz was Respondent.  In this case, those roles are reversed.  Because of the need to refer to the Complainants and Respondents in both cases, confusion can be avoided by calling Plaintiff "Rutz" and by calling Defendant Discover Financial Services (hereinafter called "Discover") by its name.

4.     The 80-year-old Plaintiff, Rutz, has never in his life filed a complaint in court, and finds the amount of research required for correct formatting, correct pleading, and correct content, all conforming to the guidelines imposed in your excellent and helpful *Manual for Pro Se Litigants* (Revised 04/06) of the United States District Court, Western District of Arkansas, to be quite intimidating.  Under this high-pressure 10-day time limit, he feels like he's cramming for a bar exam in trademark litigation.

**C. Who are the Plaintiff and Defendant "et al"s?**

1.     Hundreds are expected to join, on the basis of facts to be presented in this pleading.  But it is not yet  filed as a class action because at this point, Rutz doesn't know how, nor does he yet know if it is either necessary or optimal at this time.

**D. Why are the damage amounts pleaded so high?**

1.     Rutz expects to prove, to a jury of his peers, that these amounts may be too low.  This case involves many of the issues the court considered in CV-08-1188-PHX-DGC, Neon Network vs. Aspis Liv, except that although in the Order and Default Judgment, Plaintiff got his domain name back,  the

request for an award of prejudgment taxable costs was denied without prejudice.  Since in this case, the damages which have been accruing to hundreds of yet-to-be-included plaintiffs through the actions of hundreds of yet-to-be-included defendants over many years are unknown, Rutz has requested what he believes are low estimated damage amounts until the full number of plaintiffs in this case has been reached, and discovery has uncovered the damages which, added together, will total the amount to be claimed.

**E.  How brief should this filing be?**

1.      Rutz feels the constraints of this District Court's requirement that his complaint should "be as brief as possible."

2.      Discover, both in their original Complaint to NAF dated December 2, 2011, and in their later filing after NAF ordered them to re-file because they had mistakenly included **DiscoverRebates.com,** (which they had previously **purchased from Rutz** for $2,000.00 through an intermediary so that Rutz would not know that Discover was the purchaser, immediately after Rutz had fully informed two of Discover's principals of the great value of the Rutz Marketing System to any of the four major credit card issuers **or to Rutz if he develops his system independent of any connection to Discover or American Express or MasterCard or Visa**) included exhibits which brought the total thickness of their complaint to over ½ inch.

3.      Rutz' response was only 8 pages.

4.      The way some courts work, Rutz would include this (so far) 2/3" of documentation in an equally- voluminous pleading (not **answer** because this is, by requirement of this Court, an **Original Proceeding),** bringing the total thickness of this petition to at least 1 1/2" and requiring from Rutz at least six weeks more research than is allowed by the 10-day deadline imposed on him by NAF.

5.      Rutz believes that submitting this pleading as a tome that  thick would not, at this point, endear him to Whomever has to review it.

6.      He therefore continues under the Court's wise mandate that this pleading "be as brief as

possible" while presenting his case in his easily-understood native language as a wordsmith, rather than making an artificial attempt to imitate a lawyer speaking legalese.

**F. Why did Discover pay Rutz $2000 for DiscoverRebates.com, then later decide to acquire the subject domains merely by paying NAF a filing fee of $1200, in doing what Rutz claimed in his Response was an act of REVERSE DOMAIN HIJACKING, a UDRP term of art not yet well recognized in the world of trademark litigation outside the UDRP?**

1.      Rutz expects the answer to this important question to be discovered during discovery.

**G. Does Plaintiff intend to later include NAF, ICAAN, or GoDaddy.com, LLC as Defendants?**

1.      Most certainly and emphatically NO, unless and until discovery unearths evidence of their complicity in a tort, or the Court so rules.

**H. Give a simple, clear description of Plaintiff's UDRP experience which will enable a better understanding of his pleading.**

1.      Given the existence of millions of cybersquatted domain names, with more avalanches of new registrations pouring millions of dollars into the coffers of their Registrars every month, ICAAN of necessity created its NAF (National Arbitration Forum) as a highly-efficient slaughterhouse for obvious cybersquatters.  Without such a system, Rutz' 150 or so domain names, none of which were registered for cybersquatting purposes, but all of which were registered for business purposes, could not be efficiently protected from cybersquatters.

2.      ICAAN then offered its Registrars its UDRP (Uniform Domain Resolution Policy) to be incorporated into a Contract between Registrant and Registrar, to which Registrants must re-agree (but which most probably don't bother to peruse acres of fine print to see if there have been any changes) every single time he registers a domain name ... and most of the world's registrars, including GoDaddy.com, LLC, adopted it.

3.      The Contract makes it impossible to appeal any NAF decision within the ICAAN system, because by said Contract, all its decisions are Final.

4.      The Contract stipulates that the NAF Panel has the power to decree that Registrar must transfer disputed domain names from one disputant to another unless a case is filed in a court of competent jurisdiction within 10 working days from the date of its Decision.

5.      Here's how this system worked in my case:

6.      Discover, in their filing to NAF, claimed **bad faith** behavior of Rutz against Discover.

7.      Rutz, having no relevant contract with Discover, is confused by being accused of **bad faith** against Discover, while his contract is written quite precisely to make it a 2-party contract only between Rutz and Registrar.

8.      Here's how they twist the system to make the **bad faith** charges stick: Starting with the requirement that a **trademark** must be neither **identical** nor **confusingly similar** to an already-registered mark, they **selectively** built into their system a carefully-selected body of friendly (to them) case law both from the Federal Court system and from the NAF Arbitration system which made it dead easy to slaughter cybersquatters, while at their pleasure they can refuse to cite or even acknowledge cases favorable to an accused Respondent such as Rutz.

9.      As a simple example, let's track the complaint and defense of Rutz' most important domain name, DiscoverDiscounts.com. Consider Discover's statement in its complaint: "The Offending Domains are identical and confusingly similar to Complainant's marks because they fully incorporate Complainant's DISCOVER ® mark." Not merely "confusingly similar", but **identical ...** and at every point in its complaint Discover continued to dump truckloads of apples-to-oranges cites confusingly irrelevant to said points.

10.      This is easy to prove. Suppose Rutz, in jury selection, is holding two signs. On one is written "Discover" and on the other is written "Discover Discounts."

11.      Rutz asks each prospective juror just two questions: "In your opinion, are these two signs identical?", and "In your opinion, are these two signs 'confusingly similar'? Two affirmatives and she's on my jury! And how many peremptory challenges can Discover afford to burn?

12.     But suppose that due to some rule, Rutz is not allowed to stack the jury with 12 peers who already agree to the verdict he is seeking.  What to do?  He will simply replace the two signs with one reading "Men's Bathroom" and one reading "Women's Bathroom."  Either way, merely empanelling the jury wins the case!

13.     Discover's entire case is built on numerous cites showing that the mere registration of an "offending name" (Discover is constantly pleading conclusions as facts) is evidence of **bad faith**, a term of art with a somewhat different meaning in UDRP proceedings from that in the legal world outside of the National Arbitration Forum.

14.     So, since the mere act of registering DiscoverDiscounts.com had already labeled Rutz as a **bad faith** cybersquatter, he was **already branded "GUILTY!" before he was even hauled into the arbitration!**

## I.  The Massively Diluted State of the Discover Trademark

1.

- USPTO.gov's TESS (Trademark Electronic Search System) lists 766 live trademarks using the word "discover."

- 16 of these 766 are standard character marks, which means no artwork, just the word "discover", and all 16 are owned by entities other than Discover and its affiliates

- There are at least 16 more uses of the single word "discover" with art added.

- The other 700+ trademarks all include the word "discover."

2.     Yet Discover states that **"The registration mentioned above (DISCOVER) shows ownership of the exclusive right to use this mark in U.S. Commerce."**  If Discover is unable to defend against 30+ others using the single word "discover" as their trademark, why should anybody believe they have any exclusive right in the 700+ other trademarks where "discover" is combined with one or more other words?

- 6 -

3.     And when Rutz twice phoned WHOIS (holder of the entire global database of domain names) to inquire as to the possibility of getting a list of domain names with the word "discover", he received answers like "Impossible!" and "There are millions of them!"

4.     Yet Discover freely cites numerous cases asserting that the mere addition of generic words to their trademark "Discover" is evidence of **bad faith** cybersquatting.  When Googling "bad faith", here is the first legal definition which shows up:

**J. Legal definition of <u>Bad Faith</u>:**

1.

*The fraudulent deception of another person; the intentional or malicious refusal to perform some duty or contractual obligation.*

Bad faith is not the same as prior judgment or <u>Negligence</u>. One can make an honest mistake about one's own rights and duties, but when the rights of someone else are intentionally or maliciously infringed upon, such conduct demonstrates bad faith.

The existence of bad faith can minimize or nullify any claims that a person alleges in a lawsuit. <u>Punitive Damages</u>, attorney's fees, or both, may be awarded to a party who must defend himself or herself in an action brought in bad faith.

Bad faith is a term commonly used in the law of contracts and other commercial dealings, such as <u>Commercial Paper</u>, and in <u>Secured Transactions</u>. It is the opposite of <u>Good Faith</u>, the observance of reasonable standards of fair dealings in trade that is required of every merchant.

**A government official who <u>selectively enforces</u> a nondiscriminatory law against the members of a particular group or race, thereby violating the <u>Civil Rights</u> of those individuals, is acting in bad faith.**

West's Encyclopedia of American Law, edition 2. Copyright 2008 The Gale Group, Inc. All rights reserved.

2.     The Court's attention is called to the best example West could come up with for **bad faith, which has been bolded in the above definition:  Selective Enforcement!**  In their belief that they have exclusive right of use of the word "discover" in trademarks and domain names, Discover bypasses

hundreds of thousands of alleged infringers to **selectively enforce** its alleged right against Rutz!

3.      If, as the West definition implies, **selective enforcement** is a good example of **bad faith**, and because Discover has successfully won that case based on their false accusation about a postage-stamp-sized piece of evidence presented to the NAF Panel as an example of Rutz' **bad faith,** then Rutz believes the massive amount of evidence he will present in this case will exhibit Discover as the Poster Child of **bad faith**.

**K. The NAF Panelist ignores Rutz' pleading.**

1.      The Panelist filled 2 ½ pages of her 9-page Decision with a somewhat reasonable summary of the Rutz side of the case, then consistently ignored all of it while considering only whether Discover had filled in the blanks where she could check off the requirement that Discover had "proved" Rutz' guilt on all three "limbs" of The Policy on her boilerplate form, to award the domains to Discover.

2.      The Panelist also totally ignored the evidence of **Reverse Domain Hijacking** submitted by Rutz against Discover.  Since zero attention was devoted to dealing with it in the NAF Arbitration, it must of necessity be dealt with in discovery, and in the jury deliberations.  Rutz believes it will be easy to convince a jury of his peers, using massive amounts of evidence already obtained, that Discover was awarded the subject domains by perpetrating one of the most egregious examples of **bad faith** ever committed, while accusing Rutz of exactly that, in order to hijack his domain names.

3.      Rutz calls the attention of the court to the fact of Discover's $1200 filing fee paid to the NAF to cover the costs of conducting the Arbitration.  From his research, Rutz has discovered that a trademark attorney competent to rule in such an important case as this, such as Panelist Dawn Osborne of Palmer Biggs Legal, probably receives something in the neighborhood of $300 per hour.  Since the $1200 fee probably covers most or all of NAF's overheads and operating costs, how many hours could she have possibly spent going through the more than 1/2" of pleadings, exhibits, and responses, plus preparing and typing her response?  How could Rutz get a fair hearing in a situation like that where an examination of her Decision shows that she found zero time to give any consideration to Rutz'

Response?

**L.  Purpose of NAF UDRP Arbitrations.**

1.      The NAF UDRP arbitrations were designed and created to wipe out cybersquatters en masse, while Federal Courts are equipped to handle Federal trademark cases.  What has happened is that outfits like Discover have discovered that winning a trademark case in a NAF Arbitration for $1200 is much less expensive than filing the case in Federal Court where costs can quickly skyrocket to tens of thousands of dollars.

2.      This now-routine use of an NAF Arbitration to resolve trademark cases has added layers of abuse to an already-abusive system where NAF is judge and jury and the Registrar is contract hangman.  Rutz believes the system <u>must</u> function that way to effectively deal with millions of cybersquatters, without which the whole Internet system of websites and domain names could not be efficiently protected.  But while Rutz applauds the professionalism and efficiency of NAF and Registrar GoDaddy.com, LLC (and *especially* GoDaddy's people who are uniformly top level), he seriously resents Discover and their Counsel's abuse of that system.  At this point, Rutz could already, even before discovery, include another 20 to 30 pages of evidence displaying Discover's **bad faith** in this action.

3.      Further, there has developed, over the past few years, a new view of domain names.  In the early days of domain name disputes (from whence Discover has drawn many of their cites), courts tended to hold that a domain name was nothing more than an **indicator of source**, and any domain name that contained a trademark would be interpreted by the public as indicating a site **coming from** the owner of that trademark.

4.      In the past few years, however, courts have begun to acknowledge that domain names can also serve as **content** indicators, meaning that they don't indicate where a Website **comes from** but what it is **about**.

5.      As long as there is no confusion as to source, such content-indicating uses of domain names are

likely to be fair uses of the trademarks for others.  The two leading cases in this vein are the 7th Circuit's *Ty v. Perryman* (upholding the right of an online retailer to use the domain name *bargainbeanies.com* to truthfully tell the public that she sold Beanie Babies at bargain prices), and the 9th Circuit's more recent *Toyota v. Tabari* (upholding the right of a car dealer to register and use a domain name containing the term TOYOTA to truthfully indicate a car brand available for sale.)

**M.  Why and how Section 43 (15 U.S.Code Section 1125) should effectively resolve this case:**

1.      Here's a paragraph from page 225 of U.S.C. Section 23. *Testimony in Patent and Trademark Offices cases,* under **TITLE VIII - FALSE DESIGNATIONS OF ORIGIN, FALSE DESCRIPTIONS, AND DILUTION FORBIDDEN** at page 225 of Section 43 (15 U.S.C. Section 1125). **False designations of origin; false description or representation.**

2.      This paragraph at (a)(d)(1)(B)(ii), reads:

**(ii)  Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that <u>the person believed</u> and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.**

3.      Can you believe this paragraph is really in the U.S. Code?  Discover's entire case is built on proving my **bad faith** in filing and using DiscoverDiscounts.com!  This paragraph blows their whole case out of the water!  The "and had reasonable grounds" part is easy for the jury to understand, and "the person believed" part is even easier.

4.      The following is  from Rutz' notes containing the draft of his Opening Statement to a jury of his peers:

5.      While looking them straight in the eyes, holding up a 3-foot wide white board with that paragraph printed on it in large letters and reading it to them and explaining that it's the law under which this case was filed, I then make the statement:

        "I believed and had reasonable grounds to believe that the use of the domain name DiscoverDiscounts.com was a fair use or otherwise lawful."  (I point to each word as I read it.)

6.      "Please hear me say it once more:  I believed and had reasonable grounds to believe that when I created the domain name DiscoverDiscounts.com and registered it with Registrar GoDaddy.com on December 31, 2004, the use of it was a fair use or otherwise lawful.  I believed it then, I've believed it ever since, and I believe it to this minute.

"Notice that the law does not say that the <u>jury</u> must believe whether it was fair use or otherwise lawful.  All you have to determine (I'm pointing at the words) is that **I believed it!**  As soon as you determine that **I believed it**, it's Game Over, I win, they lose, and we only have one more item to take care of:  my claim against them for compensatory damages of at least $100 Billion and punitive damages of at least $200 Billion.

7.      "I intend to show you *why* those two numbers should well be considerably higher."

8.      At this point Rutz, having brought at least 50 to 60 friends, children, and grandchildren who have known him collectively for a total of several centuries, will have them sworn in as material witnesses, repeat the above statement, and ask each one if they believe I was telling the truth when I made that statement.

**N. What is the relevant order of magnitude of damages suffered in the NAF Arbitration Case, compared with the damages averred in this Federal Court case?**

1.      In a NAF Arbitration, a high percentage of content is directed to hypotheticals.  In Discover vs. Rutz, a huge percentage of total effort was expended toward minutely analyzing computer-generated screenshots which theoretically could have caused Discover to lose a possible sale to a competitor.  Discover can never prove this actually happened.  Rutz can prove that it did NOT happen.

2.      In most courts outside an Alice-in-Wonderlandish cyberthetical NAF Arbitration, if a complainant comes in with a cup of McDonald's coffee, complete with videos, witnesses, thermometers, lab tests proving the thermometer was accurate, and tries to cite the famous $600,000 case where an age-challenged lady suffered 3rd-degree burns when she spilled coffee all over her lap while trying to open the lid, the judge will probably ask several questions to determine if there were

any damages.

3.      If the complainant says no, but it's been proven how dangerous 190-degree coffee is, and in front of all these witnesses, McDonald's sold him the coffee anyway, then at some point, probably early on, the judge, having heard the fact that there were <u>zero damages</u>, will tell the complainant in some kind of legal language to take his case Elsewhere.

4.      Welcome to the closed-box quasi-legal world of NAF litigation where even basic legal terms of art have different meanings, yet NAF has the power to issue decisions, with <u>dead</u>lines where the operative portion of the word is <u>dead</u>, as in what happens to Rutz' domain names if he is unable to muster whatever it takes to get this pleading filed and datestamped … **and noticed to** Registrar, within 10 days of NAF's edict.  As Rutz is drafting these pleadings and far from completing them and other Court-required documentation, it is already 4:30 AM Central Time here in Arkansas, the Federal Courthouse is an hour's drive away in Fayetteville, and he is desperately trying to stay awake and coherent (with a little help from coffee) long enough to meet this afternoon's filing **dead**line.

5.      Even though there is much more evidence to be presented to the Court, Rutz has run out of time to include it.

**O. Rutz therefore pleads that This Honorable Federal Court:**

- Honor his in forma pauperis filing,

- Honor his pro se appearing,

- Honor his request that this case be tried before a jury of his peers,

- Honor his request for pro bono assistance in re-filing this pleading if the court finds it unacceptable in format or content or inclusion of "et al" petitioners and defendants,

- Forgive the handwritten page numbers because Rutz could not persuade his computer's trusty Linux Ubuntu operating system to cough them up.

- Grant the restoration of  all of his domain names named in this pleading,

- Grant the restoration of all other domain names which may be added by "et al"s as they join this litigation,

- Grant the $100,000,000,000.00 Compensatory Damages (or whatever larger or smaller amount is finally determined to be due to Rutz et al), and

- Grant the $200,000,000,000.00 Punitive Damages (or whatever larger or smaller amount is finally determined by The Court.

**ROBERT L. RUTZ HEREBY AVERS ALL THE ABOVE.**

Robert L. Rutz